DB:CMP/VR
F.#2011R00772

12 M 1002

- - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

NICOLAE POPESCU,
    also known as "Nae,"
DANIEL ALEXE,
DMITRU DANIEL BOSOGIOIU,
    also known as
    "Dmitru Busogioiu" and "Ioghi,"
EMIL BUTOI,
    also known as "Emil Popescu,"
AUREL COJOCARU,
OVIDIU CRISTEA,
    also known as "Ica,"
NICOLAE GHEBOSILA,
    also known as "Nicu Lutac,"
    "Nicu A Lui Tac" and "Nicu Tac,"
FABIAN MEME,
    also known as "Fabian Maluka,"
CRISTEA MIRCEA,
ION PIEPTEA,
DRAGOMIR RAZVAN,
    also known as "One Arm,"
NICOLAE SIMION,
    also known as "Schilodul"
    and "Skilodul," and
FNU LNU,
    also known as "George Skyper"
    and "Tudor Barbu Lautaru,"

        Defendants.

- - - - - - - - - - - - - - - - - - X

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF ARREST WARRANTS

(T. 18, U.S.C., §§ 371,
1349, 1543, 1956 and
2320)

EASTERN DISTRICT OF NEW YORK, SS:

        STACY NIMMO, being duly sworn, deposes and states that

she is a Special Agent of the Federal Bureau of Investigation

("FBI"), duly appointed by law and acting as such.

COUNT ONE
WIRE FRAUD CONSPIRACY

In or about and between April 2011 and the present, both dates being approximate and inclusive, in the Eastern District of New York and elsewhere, the defendants NICOLAE POPESCU, also known as "Nae," DANIEL ALEXE, DMITRU DANIEL BOSOGIOIU, also known as "Dmitru Busogioiu" and "Ioghi," EMIL BUTOI, also known as "Emil Popescu," AUREL COJOCARU, OVIDIU CRISTEA, also known as "Ica," NICOLAE GHEBOSILA, also known as Nicu Lutac," "Nicu A Lui Tac" and "Nicu Tac," FABIAN MEME, also known as "Fabian Maluka," CRISTEA MIRCEA, ION PIEPTEA, DRAGOMIR RAZVAN, also known as "One Arm," NICOLAE SIMION, also known as "Schilodul" and "Skilodul," and FNU LNU, also known as "George Skyper" and "Tudor Barbu Lautaru," together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, to wit: interstate and international wire transfers and Internet communications, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1349)

2

COUNT TWO
MONEY LAUNDERING CONSPIRACY

In or about and between April 2011 and the present, both dates being approximate and inclusive, in the Eastern District of New York and elsewhere, the defendants NICOLAE POPESCU, also known as "Nae," DANIEL ALEXE, DMITRU DANIEL BOSOGIOIU, also known as "Dmitru Busogioiu" and "Ioghi," EMIL BUTOI, also known as "Emil Popescu," AUREL COJOCARU, OVIDIU CRISTEA, also known as "Ica," NICOLAE GHEBOSILA, also known as Nicu Lutac," "Nicu A Lui Tac" and "Nicu Tac," FABIAN MEME, also known as "Fabian Maluka," CRISTEA MIRCEA, ION PIEPTEA, DRAGOMIR RAZVAN, also known as "One Arm," NICOLAE SIMION, also known as "Schilodul" and "Skilodul," and FNU LNU, also known as "George Skyper" and "Tudor Barbu Lautaru," together with others, did knowingly and intentionally conspire to engage in monetary transactions, to wit: deposits, withdrawals and transfers of funds and monetary instruments, in and affecting interstate and foreign commerce, by, through and to financial institutions, in criminally derived property that was of a value greater than $10,000 and that was derived from specified unlawful activity, to

3

wit: wire fraud, in violation of Title 18, United States Code, Section 1343, contrary to Title 18, United States Code, Section 1957(a).

(Title 18, United States Code, Sections 1956(h), 1957(a) and 1957(d)(1))

COUNT THREE
PASSPORT FRAUD CONSPIRACY

In or about and between April 2011 and the present, both dates being approximate and inclusive, in the Eastern District of New York and elsewhere, the defendants NICOLAE POPESCU, also known as "Nae," DANIEL ALEXE, DMITRU DANIEL BOSOGIOIU, also known as "Dmitru Busogioiu" and "Ioghi," EMIL BUTOI, also known as "Emil Popescu," AUREL COJOCARU, OVIDIU CRISTEA, also known as "Ica," FABIAN MEME, also known as "Fabian Maluka," CRISTEA MIRCEA, ION PIEPTEA, DRAGOMIR RAZVAN, also known as "One Arm," and NICOLAE SIMION, also known as "Schilodul" and "Skilodul," together with others, did knowingly and intentionally conspire to falsely make, forge and counterfeit passports and instruments purporting to be passports, with the intent that the same would be used, and to use, attempt to use and furnish to another for use such false, forged and counterfeited passports, contrary to Title 18, United States Code, Section 1543.

(Title 18, United States Code, Sections 1543 and 371)

4

COUNT FOUR
TRAFFICKING IN COUNTERFEIT SERVICE MARKS

In or about and between April 2011 and the present, both dates being approximate and inclusive, in the Eastern District of New York and elsewhere, the defendant NICOLAE POPESCU, also known as "Nae," together with others, did knowingly and intentionally traffic in goods and services, and knowingly use counterfeit marks, to wit: Amazon.com service marks, on and in connection with such services.

(Title 18, United States Code, Section 2320)

The source of your deponent's information and the grounds for her belief are as follows:

1.      I have been a Special Agent with the FBI since December 2008. I am assigned to an FBI squad tasked with investigating international organized crime, including Romanian organized crime. My responsibilities currently include, among other things, investigating wire fraud, money laundering, intellectual property violations and various forms of Internet fraud, including fraud conspiracies involving Internet auction and marketplace sites.

2.      I have personally participated in the investigation of the offenses discussed below. I am familiar with the facts and circumstances of this investigation from, among other things: (a) my personal participation in this investigation, (b) reports made to me by other law enforcement

5

agents and agencies, (c) information obtained from confidential
sources of information, including financial records,
(d) consensual recordings and (e) my review of records obtained
pursuant to grand jury subpoenas and of publically-available
information.  Except as explicitly set forth below, I have not
distinguished in this affidavit between facts of which I have
personal knowledge and facts of which I have knowledge through
others.  Where statements of others are set forth, they are set
forth in substance and in part.  Foreign language statements may
be set forth based on draft summary translations.  Because this
affidavit is being submitted for the limited purpose of
establishing probable cause for the arrests of the defendants
NICOLAE POPESCU, also known as "Nae," DANIEL ALEXE, DMITRU DANIEL
BOSOGIOIU, also known as "Dmitru Busogioiu" and "Ioghi," EMIL
BUTOI, also known as "Emil Popescu," AUREL COJOCARU, OVIDIU
CRISTEA, also known as "Ica," NICOLAE GHEBOSILA, also known as
Nicu Lutac," "Nicu A Lui Tac" and "Nicu Tac," FABIAN MEME, also
known as "Fabian Maluka," CRISTEA MIRCEA, ION PIEPTEA, DRAGOMIR
RAZVAN, also known as "One Arm," NICOLAE SIMION, also known as
"Schilodul" and "Skilodul," and FNU LNU, also known as "George
Skyper" and "Tudor Barbu Lautaru," I have not set forth each and
every fact learned during the course of this investigation.
Instead, I have set forth only those facts that I believe are
necessary to establish probable cause for the arrest.

6

FACTUAL BACKGROUND

3.    Based on my training, experience and information obtained in the course of this investigation, including information obtained from the Internet Crime Complaint Center ("IC3")[1], and other investigations involving the FBI and various local law enforcement agencies, I have learned about the operation of fraud schemes involving online marketplaces, and particularly about certain schemes originating in Romania.  The perpetrators of these schemes have saturated various Internet marketplaces and Internet auction websites, such as eBay.com, Cars.com, AutoTrader.com and CycleTrader.com, with fraudulent advertisements for cars, motorcycles, boats and other high value items for sale.  Unbeknownst to the victim buyers, these items do not exist, but are merely being advertised to lure buyers into transferring funds to the perpetrators of these fraud schemes.

4.    In 2011, a Romanian citizen residing in the United States (the "CW"), began cooperating with the government.[2]

_____

[1]    The IC3 was established as a partnership between the FBI and the National White Collar Crime Center to serve as a means to receive Internet-related criminal complaints and to develop and refer the criminal complaints to federal, state, local or international law enforcement and/or regulatory agencies for further investigation.

[2]    The CW has pleaded guilty in the Eastern District of New York, pursuant to a cooperation agreement, to an Information charging wire fraud conspiracy, money laundering conspiracy, aggravated identity theft and immigration fraud in connection with the CW's participation in the type of Internet fraud described herein, as well as credit card fraud, among other

7

In the course of extensive debriefings, the CW related the CW's past criminal relationship with several of the defendants, including NICOLAE POPESCU, also known as "Nae," NICOLAE SIMIONE, also known as "Schilodul" and "Skilodul," ION PIEPTEA, NICOLAE GHEBOSILA, also known as Nicu Lutac," "Nicu A Lui Tac" and "Nicu Tac," and others. According to the CW, in intermittent periods beginning in approximately 2000 and until the CW began cooperating with the government, the CW served as a money launderer for POPESCU, SIMIONE, PIEPTEA, GHEBOSILA and others engaged in the criminal activities described herein, as well as other fraudulent schemes.

5.    As described in detail in the "Probable Cause" section below, during the time period charged in this Complaint, the CW has engaged in proactive cooperation under the supervision of the FBI. Among other things, the CW has engaged in hundreds of hours of consensually-recorded (both audio and video) conversations with the defendants via Skype, telephone, SMS/text messages and other means of communication. Under the supervision of the FBI, the CW has also used fraudulent identification documents obtained from the defendants to open bank accounts in

---

crimes. The CW is cooperating with the government in the hopes of receiving leniency at sentencing, among other things. The CW's information has been corroborated through, inter alia, the extensive consensual recordings the CW has made during the period of the CW's proactive cooperation (described more fully below), bank records, victim complaints and evidence and information obtained from local and foreign law enforcement authorities.

the United States for the purpose of receiving and transferring criminal proceeds on the defendants' behalf.  The CW has generally kept approximately 10% to 15% of each transaction as a "fee" for the CW's services, which fees the CW has provided to the government for purposes of eventual forfeiture to the government and restitution to the victims.

6.     Based on the evidence gathered in this investigation and the other sources described above, I have learned that Romanian-based Internet marketplace fraud schemes, such as the one described herein, often function in the following manner:

a.     First, Romanian coconspirators (who usually live in Romania or elsewhere in Europe but have a good command of English) post an advertisement for an item, such as a used car, on websites such as AutoTrader.com.  These advertisements usually contain photographs and detailed descriptions of the items that are purportedly available for purchase.  In truth, however, these ads are completely fictitious – the goods do not exist and, thus, are not available for purchase.

b.     An interested buyer then contacts the purported "seller" of the item, and the parties communicate and negotiate via email.  The "seller" adopts an American-sounding name for these communications.  Sometimes, in the case of phony vehicle sales, the "seller" purports to be an American car

9

dealership and may even create a fake dealership website.  When the parties reach an agreement, the "seller" may send a sales agreement, fraudulent certificate of title or even a CarFax report to the victim buyer.

        c.    In the course of this investigation, the so-called "sellers" often sent invoices by email to the victims purporting to be from Amazon Payments, PayPal or similar online payment services, with instructions for the victim buyer to transfer the money to the seller.  These invoices, however, were fraudulent – individuals in Romania, known in the Romanian Internet fraud community as "hackers," design these invoices to appear identical to communications from legitimate payment services.  As described in detail below, these hackers, in an attempt to make the invoices appear legitimate, identify the sender by such names as "checkout@invoice-amazonpayments.com" and include counterfeit service marks in the email, such as the following registered service mark:

amazonpayments

The so-called "Amazon Payments" emails that were sent to victims in the course of this investigation even included a promise that Amazon Payments would cover the transaction for "deliberate and material misrepresentation[s]," such as "paying for a vehicle and

10

never receiving it," and also included a warning to "Be Wary of Internet Scams."

d.     The phony invoices generally include wire transfer information, including name and address, bank account number and routing number, for another member of the conspiracy residing in the United States.  These coconspirators, known as "arrows," are often Romanian citizens who conduct banking and other financial transactions using fraudulent European passports and other fraudulent means of identification.  As described in further detail below, the defendants AUREL COJOCARU, FABIAN MEME, also known as "Fabian Maluka," and EMIL BUTOI, also known as "Emil Popescu," are producers and traffickers of these fraudulent passports and other immigration documents.  The arrows use these fraudulent identification documents, which include their real photographs but fake names and other identifying information, to open bank accounts in the United States for the purpose of receiving the victims' transfers of funds.

e.     As described in detail below, in the course of this investigation, the CW opened multiple bank accounts, under the supervision of the FBI, using fraudulent passports supplied by POPESCU, COJOCARU and others.  Based on the CW's historical knowledge of these Internet fraud schemes, the CW's nearly constant contact with the defendants at various periods during the investigation and the fact that the bank accounts were

11

opened under false names and with fraudulent passports provided by the defendants, the CW knew that the sole purpose of these bank accounts was to receive funds from unwitting victims, and then to serve as a means of transferring some or all of these proceeds to the defendants. Thus, each of the bank accounts identified herein, which were opened by the CW under the supervision of the FBI, refer to bank accounts created and used to receive victim funds and transfer those proceeds to the defendants abroad.

> f.    After receiving the fraudulent invoice, the victim buyer transfers the agreed-upon payment by bank transfer, MoneyGram, Western Union or other transfer service to the account identified on the fraudulent invoice.[3] After the money is transferred to the bank account, one of the coordinators of the scheme in Romania or elsewhere provides pertinent information about the transfer, including the name of the sender, the amount of the transfer and the bank account to which the funds were transferred, to an arrow (or to a U.S.-based manager, who in turn provides that information to the arrow) so that the arrow can pick up the funds. In this case, certain defendants, including NICOLAE POPESCU, routinely provided the arrow with a description of the nonexistent merchandise and invoice number of the

---

[3]    Victims sometimes even obtain car loans and other bank loans to pay for this nonexistent merchandise.

fraudulent "Amazon Payments" or other online payment invoice, in the event that a bank employee asked the arrow to explain why he or she was receiving the funds. This information may be transmitted by email, text message or other form of communication. In this case, for example, defendants including NICOLAE POPESCU, DMITRU DANIEL BOSOGIOIU, OVIDIU CRISTEA, NICOLAE GHEBOSILA, NICOLAE SIMION, DANIELE ALEXE, as well as other coconspirators, shared email accounts with the CW, and used those email accounts to provide the relevant wire transfer information to the CW so that the CW could arrange to pick up the criminal proceeds and send them abroad to the defendants and others.

g. The next and final step in the scheme involves sending the criminal proceeds back to the higher-ranking members of the conspiracy, such as the defendants, who generally are based in Romania or elsewhere in Europe. For the coconspirators abroad, this is often the most difficult stage in the process. If the bank that receives the transfer from the victim buyer becomes aware of the fraud (if, for example, the victim files a complaint with the bank), the bank may freeze the subject account and prevent any transfers out of the account. Thus, the arrow must transfer the funds, sometimes broken up into multiple transactions to avoid reporting requirements, quickly.

7. In the course of this investigation, certain members of the conspiracy, including ION PIEPTEA, as described

below, preferred to receive the fraud proceeds in cash.  Other methods were also used to transfer and conceal the sources of the illegal proceeds.  For example, as described in detail below, the CW was sometimes directed to obtain luxury watches, which were eventually sent to coconspirators in Europe.  The arrows generally keep a percentage - usually in the range of 5% to 10% - of the money received from the victim before remitting the balance to the coconspirators abroad.

     8.     On or about November 24, 2010, the Ministry of Justice of Romania indicted POPESCU, BOSOGIOIU, CRISTEA and others for involvement in organized crime, fraud, money laundering and other criminal violations based on their involvement in similar Internet-based fraud schemes and other crimes.  POPESCU had previously been arrested on these charges on or about April 6, 2010.  POPESCU was released on bail and thereafter fled to Hungary, where he was arrested as a fugitive on or about August 30, 2011 and returned to Romania.  In addition, based on a treaty request made by the United States government shortly after POPESCU's arrest, Hungarian authorities identified and froze approximately $45,000 in assets that POPESCU held in Hungary for eventual seizure and forfeiture to the United States government.[4]

---

[4]     The government is currently working with various European law enforcement authorities to identify additional assets held by the defendants in Europe that may represent the

9.     Many of the bank accounts referenced herein, which were opened at the direction of the defendants in furtherance of the Internet fraud and money laundering schemes described in detail below, were established in the Eastern District of New York. Furthermore, multiple banking transactions undertaken in furtherance of these schemes occurred within the Eastern District of New York.

PROBABLE CAUSE

A.   <u>NICOLAE POPESCU, DMITRU DANIEL BOSOGIOIU and OVIDIU CRISTEA</u>

10.     The CW has advised that the CW first became involved in fraud, including credit card fraud and Internet fraud, in or about 2000, and that the CW became aware of the defendant NICOLAE POPESCU's high-ranking role in a Romanian fraud ring in or about 2002. At that time, POPESCU was known to have employed a large number of coconspirators, including the above-described "hackers," engaged in various forms of fraud in Romania and elsewhere in Europe. POPESCU and the CW have remained in sporadic contact over the past approximately seven to ten years.

11.     In or about the spring of 2011, the defendant CRISTEA MIRCEA put the CW in contact with POPESCU, and in or about May 2011, the CW began engaging in consensually-recorded

---

illicit proceeds of the criminal schemes described in this Complaint, with the objective of seizing those assets for eventual restitution to victims and/or forfeiture to the United States government.

15

conversations at the direction of the FBI, usually conducted via Skype, with POPESCU.

12.    In the course of these conversations, which occurred over the span of several months, the defendants POPESCU, DMITRU DANIEL BOSOGIOIU and the CW discussed specific transactions, including, among others, those described below.

### The Maryland Victim

13.    Under the supervision of the FBI, the CW opened five bank accounts in the name "Daniel Marquez," using a fraudulent Spanish passport provided by POPESCU: two accounts at Wells Fargo (the "Wells Fargo Marquez Accounts"), two accounts at J.P. Morgan Chase (the "Chase Marquez Accounts") and one account at Bank of America (the "Bank of America Marquez Account").  As discussed in the "Factual Background" section above, these and the other bank accounts identified herein were used to receive victim funds and transfer criminal proceeds to the defendants. POPESCU, BOSOGIOIU and the CW also established and shared an email account to communicate about the fraud: Yahoo! email account piciorlung123@yahoo.com (the "Piciorlung123 Email Account").

14.    On or about May 24, 2011, POPESCU told the CW, in a recorded telephone conversation, that, on the following day, POPESCU expected to receive two money transfers into one of the Wells Fargo Accounts of approximately $20,000 and $35,000 each.

16

POPESCU also told the CW that POPESCU was in the process of having another $40,000 transferred to one of the Bank of America Accounts.

15.    On or about May 25, 2011, the CW received a message on the Piciorlung123 Email Account with the following subject line: "PE MARQUEZ 15 000 PE WELLS FARGO," which translates to "TO MARQUEZ $15,000 TO WELLS FARGO."  The text of the message stated, "2007 Chevrolet Tahoe LTZ," and provided the name and address of an individual residing in Maryland (the "Maryland Victim").  The CW has advised that, based on the CW's prior communications with POPESCU about transfers to the Wells Fargo Marquez Accounts and the CW's knowledge of the fraudulent scheme, the CW understood this message to be directions from POPESCU to pick up $15,000 in funds transferred from the Maryland Victim to one of the Wells Fargo Marquez Accounts for the purported purchase of a 2007 Chevrolet Tahoe truck.  POPESCU also directed the CW, through another message on the Piciorlung123 Email Account, to transfer these proceeds, by wire transfer, to three different names in Europe.

16.    Thus, on or about May 25, 2011, the CW used the fraud proceeds transferred by the Maryland Victim to one of the Wells Fargo Marquez Accounts to make two transfers, by Western Union, of approximately $2,000 each to two accounts in Romania. On or about June 1, 2011, the CW sent an additional approximately

17

$10,000, by wire transfer, to an account in Germany, which POPESCU told the CW he had established.  The government seized the remainder of the money.

### The Ohio Victim

17.   Similarly, on or about June 13, 2011, an individual in Ohio (the "Ohio Victim") filed a complaint stating that, on or about May 23, 2011, he had begun communicating with an individual using the name "Stephen F. Wonder" about a 2008 Ford F-250 truck that the Ohio Victim had seen advertised on AutoTrader.com.  The Ohio Victim and "Stephen Wonder" subsequently exchanged a series of emails in which the latter provided specific details about the truck.  The Ohio Victim and "Stephen Wonder" agreed on a price of $19,600 for the truck and discussed a delivery date for the truck. "Stephen Wonder" then emailed the Ohio Victim a fraudulent Ohio certificate of title for the truck.  On or about May 25, 2011, the Ohio Victim received an email message purporting to be from "Amazon Payments," using the counterfeit Amazon service mark cited above, directing the Ohio Victim to transfer $19,600 to the Bank of America Marquez Account.  The Ohio Victim then applied for and obtained a car financing loan from an Ohio credit union.  On or about May 31, 2011, the Ohio Victim transferred approximately $19,600 to the Bank of America Marquez Account listed in the "Amazon Payments" email.  The Ford truck, however, was never

delivered to the Ohio Victim.  In fact, on or about May 30, 2011, the CW received a message on the Piciorlung123 Email Account with the subject line "19600 pe marquez pe bofa" (translated as "$19,600 to Marquez to BofA [Bank of America]"), which the CW understood to be a reference to $19,600 being deposited in the Bank of America Marquez Account.  The CW withdrew the funds from the Bank of America Marquez Account and transferred a total of approximately $20,000 to the same German bank account discussed in Paragraph 16 above that POPESCU had previously established.

18.    The CW also received information on the Piciorlung123 Email Account regarding bank transfers by other victims, including several who filed complaints with IC3, the FBI and other law enforcement agencies.  The complaints followed the same general pattern as the fraud perpetrated on the Ohio Victim and the Maryland Victim.  Certain of the complaints, and other relevant facts, are set forth herein:

> o    On or about June 9, 2011, a car dealership in Minnesota (the "Minnesota Dealership Victim") sent a wire transfer for approximately $39,000 to one of three Wells Fargo accounts in the name of "Daniel Machado" (previously opened by the CW using a fraudulent foreign passport supplied by POPESCU - the "Wells Fargo Machado Accounts") to purchase a 2009 Audi S5 automobile, which had been advertised online by "Neuer Daniel Machado Cars." The Minnesota Dealership Victim never received the Audi and came to learn that "Neuer Daniel Machado Cars" and the shipping company identified by "Neuer Daniel Machado Cars" did not exist except as websites.  On or about June 10, 2011, the CW received a message on the Piciorlung123 Email Account instructing the CW to transfer $30,000

from a Wells Fargo Machado Account to a German bank account previously established by POPESCU. The CW transferred the $30,000 to this German bank account on or about June 10, 2011.

- "Neuer Daniel Machado Cars" also advertised a 2010 Lexus GX 460 on AutoTrader.com. On or about June 9, 2011, a car dealership in California (the "California Dealership Victim") sent a $10,000 deposit by wire transfer to one of two accounts in the name of "Daniel Machado" at Bank of America (previously opened by the CW using a fraudulent foreign passport supplied by POPESCU - the "Bank of America Machado Accounts"). On or about June 9, 2011, the CW received a message on the Piciorlung123 Email Account providing the name and address of the California Dealership Victim, with the subject line "$10000 pe Machado Bofa" (translated as "$10,000 to Machado BofA [Bank of America]"). Based on their prior discussions concerning this fraud, the CW was aware that POPESCU sent this message. The government seized these victim funds.

- On or about June 13, 2011, in response to an advertisement on CycleTrader.com for a 2008 Big Dog Mastiff motorcycle, an individual in South Carolina (the "South Carolina Victim") sent a wire transfer for approximately $11,500 to one of the Chase Marquez Accounts opened by the CW and discussed in Paragraph 13 above. The so-called seller, using the name "Stephen Graber," sent the South Carolina Victim a fraudulent email purporting to be from "Amazon Payments," using a counterfeit Amazon service mark, and directing the victim to send the funds to one of the Chase Marquez Accounts. On the same date, the CW received a message on the Piciorlung123 Email Account stating that $11,500 had been transferred to one of the Chase Marquez Accounts for a "2008 Big Dog Mastiff," and providing the fraudulent Amazon Payments invoice number that had been sent to the South Carolina Victim. Based on their prior discussions concerning this fraud, the CW was aware that POPESCU wrote this message. The government seized these victim funds.

20

## The Florida Victim

19.     BOSOGIOIU also engaged in the same pattern of Internet fraud and money laundering described above.  On or about September 9, 2011, BOSOGIOIU told the CW, in a recorded Skype conversation, that $42,900 had been wired to a bank account in the name of "David Perez" that the CW had opened at J.P. Morgan Chase Bank with a fraudulent passport provided by POPESCU (the "Chase Perez Account").  In the course of the conversation, BOSOGIOIU and the CW discussed online access to the Chase Perez Account, and BOSOGIOIU instructed the CW to withdraw $6,000 from this account.

20.     Consistent with BOSOGIOIU's statement, on or about September 9, 2011, an individual in Florida (the "Florida Victim") sent a wire transfer of approximately $42,900 to the Chase Perez Account in response to an advertisement on Cars.com for a 2010 Lexus GX460 - precisely the same make and model of car that had been advertised to the California Dealership Victim, as described above in Paragraph 18.  The Florida Victim also received a nearly identical sales agreement to the one received by the California Dealership Victim - the only differences were a few digits changed in the vehicle identification number and different odometer readings.  The CW then transferred $31,200 to a bank account in Hungary at BOSOGIOIU's direction.

21

### The Minnesota Victim

21.    In the same September 9, 2011 Skype
conversation discussed above in Paragraphs 19 and 20, BOSOGIOIU
also informed the CW that $33,500 had been wired to a bank
account in the name of "David Garcia" that the CW had opened at
J.P. Morgan Chase Bank with a fraudulent passport provided by
POPESCU (the "Chase Garcia Account").  This information reflected
a money transfer made on or about September 9, 2011, by a victim
buyer in Minnesota (the "Minnesota Victim").  The Minnesota
Victim sent a wire transfer in the amount of $33,500 to the Chase
Garcia Account in response to an advertisement on Cars.com for a
2010 Toyota Tundra.  The Minnesota Victim received the same
standard "Sales Agreement" as the California Dealership Victim
and Florida Victim, as well as a CarFax report and a "Dispatch
Sheet" for the (nonexistent) transportation company that was
supposed to deliver the vehicle.  According to the Minnesota
Victim, the "seller" had a website, www.pdgcars.com, but this
website disappeared on or about September 12, 2011.  The
Minnesota Victim never received the vehicle, and these criminal
proceeds were seized by the government.

22.    BOSOGIOIU also gave the CW wire transfer
information for additional transactions not detailed herein.  In
total, the CW received transfers from victim buyers, on behalf of
BOSOGIOIU, totaling over $170,000.  Some of the victim funds were

22

transferred abroad at the direction of BOSOGIOIU, and the remainder were seized by the government and banks.

23.    BOSOGIOIU repeatedly expressed concern to the CW about being detected by law enforcement. At one point, on or about October 23, 2011, BOSOGIOIU asked the CW to clarify the difference between federal and state law in the United States. When the CW stated that federal law is harsher and that bank fraud falls under federal law, BOSOGIOIU and the CW agreed that the FBI must be avoided. POPESCU, however, expressed less concern about American law enforcement – on or about July 28, 2011, POPESCU told the CW, in sum and substance, that "criminals will not be extradited from Romania to USA . . . it will never happen."[5]

24.    Statements made to the CW during the course of this investigation also established that POPESCU and BOSOGIOIU are close criminal associates. Among other things, they each told the CW about an arrow of Hungarian descent – to whom they referred as the "old man" or the "old guy" – who was working for them in Florida (the "Florida Coconspirator"). Indeed, when Hungarian law enforcement agents searched POPESCU's residence at

---

[5]    In the same conversation, POPESCU stated, in sum and substance, that with respect to his pending criminal charges in Romania, although he had "lots of problems, [he] is not stupid, knows people, will use [his] finances to get out as soon as possible and knows that once [he] gets out [he] will do something else, a new trick."

the time of his arrest on or about August 30, 2011, they found documents and handwritten notes containing the aliases used by the Florida Coconspirator. Shortly after POPESCU's arrest, BOSOGIOIU and the CW discussed sending $1,500 to the Florida Coconspirator to pay for the Florida Coconspirator's start-up costs. On or about October 19, 2011, BOSOGIOIU gave the CW a list of the names and bank account numbers for the various bank accounts that the Florida Coconspirator had established.[6]

25. Moreover, on or about August 31, 2012, after POPESCU was arrested in Hungary, BOSOGIOIU told the CW, in a recorded Skype conversation, that at the time of POPESCU's arrest, POPESCU's laptops and bank account information had been seized. BOSOGIOIU also assured the CW, in sum and substance, that BOSOGIOIU would try his best to keep the business running

---

[6]     On or about October 29, 2011, the Florida Coconspirator was arrested at a bank by the Eatontown Police Department in Eatontown, New Jersey for conducting transactions using fraudulent identification. On or about October 30, 2011, BOSOGIOIU advised that the "old man" (whom the CW understood to be the Florida Coconspirator) had not transferred certain unspecified funds to Romania, but rather had deposited the funds into an account he had opened at Bank of America. BOSOGIOIU told the CW the location of the "old man's" hotel and stated that BOSOGIOIU would find out where the "old man" hid the passports so that the CW could collect them. Based on this information, law enforcement agents found a plastic bag outside the hotel identified by BOSOGIOIU containing fraudulent passports with photographs of the Florida Coconspirator. The agents also found a bag concealed above ceiling tiles in the hotel laundry room containing fraudulent identification documents (for one of the Florida Coconspirator's criminal associates) that BOSOGIOIU had previously displayed to the CW on recorded Skype video chat.

while "Nae" (POPESCU) was in prison, but that BOSOGIOIU could not compare himself to "Nae." On or about September 26, 2011, BOSOGIOIU updated the CW on POPESCU's status in Romania, stating that BOSOGIOIU had paid two Romanian law enforcement officers who were escorting POPESCU to allow POPESCU to have an unmonitored telephone call with BOSOGIOIU.

26. During the course of their communications with the CW, POPESCU and BOSGIOIU also discussed other criminal associates who were integral to their criminal scheme, including AUREL COJOCARU, OVIDIU CRISTEA, also known as "Ica," CRISTEA MIRCEA and others. Among other things, POPESCU and BOSGIOIU advised the CW that COJOCARU was a primary supplier for the fake passports used to open bank accounts for the receipt of victim funds. For example, during a recorded Skype conversation on or about July 5, 2011, POPESCU complained that the last batch of passports that COJOCARU had provided contained errors and that COJOCARU had failed to pick up a $25,000 money transfer for POPESCU. POPESCU suggested to the CW that POPESCU might replace COJOCARU with another individual who makes fraudulent identification documents in London. Similarly, on or about October 12, 2011, BOSOGIOIU advised the CW that an unidentified coconspirator was waiting to receive documents from a different passport maker because COJOCARU was moving too slowly. Based on

the CW's knowledge of the fraudulent scheme, the CW understood BOSOGIOU's reference to "documents" to mean fake passports.

27.     POPESCU and BOSOGIOU also discussed their criminal associate CRISTEA with the CW.  On or about July 28, 2011, POPESCU revealed that, while he was a fugitive in Europe, having fled his pending criminal case in Romania, POPESCU "took" CRISTEA from another associate so that CRISTEA could work for POPESCU.  Also on or about July 28, 2011, POPESCU revealed that POPESCU planned to have a valuable watch delivered from Arizona to a hotel in New York City, where the CW could pick the watch up from the hotel's concierge.  Based on prior communications with POPESCU about watches, the CW understood that the watches would be used as a means of transferring criminal proceeds to POPESCU – instead of making a wire transfer of $30,000, for example, a watch worth approximately $30,000 would be purchased by one of POPESCU's associates and delivered to the CW, who in turn would make arrangements for the watch to be sent to POPESCU or one of POPESCU's associates in Europe.

28.     Shortly thereafter, on or about July 30, 2011, the CW received a call from CRISTEA in which CRISTEA identified himself as the "guy with the watches," and went on to explain that the CW could expect two packages to arrive by FedEx, one from Arizona and the other from Michigan.  A few minutes later, the CW received a text message that provided the name and

26

address of a jeweler in Michigan, as well as a FedEx tracking number. Approximately one hour later, CRISTEA called the CW to notify the CW that both packages had arrived at a designated hotel in downtown Manhattan (the "Hotel"). The CW went to the Hotel and obtained two watches from the Hotel's concierge: one from the Michigan jeweler whom CRISTEA had previously identified to the CW in the text message, and another from a jeweler in Arizona whom POPESCU had previously identified to the CW. The CW also spoke to CRISTEA over the telephone from the Hotel. CRISTEA instructed the CW to check the watches for scratches and then to throw out the boxes used to transport the watches (specifically, the outer packaging boxes, not the original watch boxes) - in other words, to destroy any evidence that the watches had been sent from the jewelers in Arizona and Michigan. The two watches that CRISTEA and POPESCU arranged for the CW to receive at the Hotel were both Audemars Piguet watches, with a wholesale value of approximately $30,000 each and a retail value of approximately $41,000 each.

29.     On or about August 1, 2011, CRISTEA called the CW and again identified himself as the "guy with the watches" and said that their "friend" (whom the CW understood to be POPESCU) had told CRISTEA to contact the CW about two watches. On or about August 4, 2011, POPESCU told the CW, during a recorded telephone conversation, that there was a "cheap watch" worth

27

about $6,000 waiting at the reception desk of the Hotel, and that the CW could expect to pick up another, more expensive watch in the next few days. The CW then picked up the two watches: a Cartier valued at approximately $7,000 from the Hotel, and an Audemars Piguet watch received from North Hollywood, California and valued at approximately $60,000, from a different hotel.

30.     Later in the day on August 4, 2011, during a recorded telephone conversation, POPESCU told the CW that POPESCU's good friend would be arriving in New York from Frankfurt, Germany, to pick up a bag with "all four" [watches] from the CW. POPESCU also stated that this person was CRISTEA's roommate in Germany.

31.     On or about August 8, 2011, the CW met CRISTEA's roommate at the Columbus Hotel in Manhattan and gave him the four watches described above for the purpose of providing the four watches to POPESCU.

32.     In later conversations in September and October 2011, BOSOGIOIU revealed that BOSOGIOIU was also doing business with CRISTEA. Specifically, on or about October 13, 2011, BOSOGIOIU told the CW that BOSOGIOIU had given a Lithuanian passport to CRISTEA for the purpose of opening a TD Bank account, and that BOSOGIOIU and CRISTEA had managed to make two transfers of approximately $45,000 each from that bank account before the account was blocked.

33.    The investigation has further revealed that POPESCU is also involved in facilitating fraudulent transactions completed by other coconspirators, including some of the defendants. For example, during a recorded telephone call on or about May 9, 2011, DRAGOMIR RAZVAN, also known as "One Arm," advised the CW that "Nae" had promised to send "one of those things" to MIRCEA for $20,000. Based on the context of the conversation and on the CW's prior dealings with RAZVAN, MIRCEA and their coconspirators, the CW understood RAZVAN's comments to mean that POPESCU had promised to send a skimming device to MIRCEA.[7] In another conversation on or about May 16, 2011, POPESCU advised the CW that POPESCU had transferred some money into MIRCEA's bank account. Based on the context of the conversation and the CW's prior dealings with POPESCU and MIRCEA, the CW understood this to mean that MIRCEA was working for POPESCU transferring victim funds.

B.    ION PIEPTEA

34.    In or about May 2011, the CW and the defendant ION PIEPTEA, whom the CW has known for several years as a result of their mutual involvement in fraudulent criminal activities, engaged in several recorded conversations in which they discussed, among other topics, fraudulent transactions and fake

---

[7]    A skimming device is a device placed on ATM machines to obtain magnetic data from bank cards used at ATM machines.

passports. In these conversations, PIEPTEA and the CW referred to the fake passports as "those things." On or about May 18, 2011, PIEPTEA and the CW discussed the possibility of working together, and PIEPTEA suggested that he could send arrows to work with the CW in the future. Subsequently, in or about February 2012, the CW reestablished contact with PIEPTEA and agreed to assist PIEPTEA in transferring the illicit proceeds of the same pattern of Internet fraud activity discussed herein, as set forth in more detail below.

35. When PIEPTEA and the CW agreed to go into business together, the CW provided PIEPTEA with account information for one of three accounts that the CW had established at J.P. Morgan Chase Bank in the name of "Martin Kemp" (the "Chase Kemp Accounts") and one of three accounts that the CW had established at Citibank, also in the name of "Martin Kemp" (the "Citibank Kemp Accounts"). The CW established the aforementioned accounts using fraudulent passports provided by NICOLAE POPESCU in the name of "Martin Kemp." POPESCU told the CW that POPESCU had obtained these "Martin Kemp" passports from the defendant AUREL COJOCARU.

36. Based on the CW's past experience with PIEPTEA, and on multiple conversations between 2011 and 2012, the CW has advised that the defendant PIEPTEA was familiar with the manner in which these bank accounts are opened in order to facilitate

30

the criminal scheme described herein.  PIEPTEA, thus, was aware
that individuals working for him used fake passports, among other
forms of fraudulent identification documents, to open bank
accounts which were to be used to receive victim funds.

37.    On or about June 9, 2012, during a recorded
Skype conversation, PIEPTEA told the CW that PIEPTEA was
expecting four money transfers from victims, in the amounts of
$18,500, $15,000, $22,000 and one other unspecified amount, into
one of the Citibank Kemp Accounts.  PIEPTEA stated that two of
the money transfers were from Australia and Sweden.  The CW
agreed to send a portion of the transferred funds, in cash, to
PIEPTEA through the mail.  On or about June 11, 2012, PIEPTEA
instructed the CW to hide the cash in inexpensive electronics
equipment.  Subsequently, on or about June 12, 2012, the CW
received a message on the Yahoo! email account
stefan_cel_mare555@yahoo.com (the "Stefan_cel_mare555 Email
Account"), which the CW shared with PIEPTEA for purposes of the
fraudulent scheme, indicating that a victim had wired $18,500
from a bank in Australia as payment for a 2007 Ducati Superbike.
The CW understood that PIEPTEA had written this message based on
their prior conversation about the $18,500 transfer.  As a
result, the CW withdrew approximately $18,400 from one of the
Citibank Kemp Accounts.

38. On or about June 13, 2012, the CW received a text message via Skype from PIEPTEA directing the CW to send the money that the CW had previously withdrawn to PIEPTEA's brother in Romania. Shortly thereafter, the CW mailed approximately $18,000 in cash, concealed in hollowed-out audio speakers, to PIEPTEA's brother at an address provided by PIEPTEA.

39. In or about June 2012, PIEPTEA and the CW engaged in other communications regarding additional fraudulent transactions for which PIEPTEA sought the CW's assistance. For example, at PIEPTEA's direction, the CW withdrew an additional approximately $25,600 from one of the Chase Kemp Accounts and mailed the cash, concealed in hollowed-out speakers, to PIEPTEA's brother in Romania. Based on the CW's past transactions with PIEPTEA and the fact the CW's bank accounts were used as a means to receive victim funds, the CW understood that these funds had been transferred by victims of PIEPTEA's fraudulent scheme into the Chase Kemp Account.

C. AUREL COJOCARU and FNU LNU, also known as "George Skyper" and "Tudor Barbu Lautaru"

40. As set forth above, the CW learned from the defendants NICOLAE POPESCU, DMITRU DANIEL BOSOGIOIU and others that AUREL COJOCARU was one of their primary suppliers of fraudulent passports, and, therefore, integral to the Internet fraud and money laundering scheme described in this affidavit. Indeed, POPESCU told the CW that the passports the CW received

32

from POPESCU in order to open the Citibank Kemp Accounts, the Chase Kemp Accounts and three Citibank accounts in the name of "Melvin Kahn" (the "Citibank Kahn Accounts"), among others, were made by the defendant COJOCARU.

41. During a recorded Skype conversation on or about June 23, 2012, the CW asked PIEPTEA about getting false identification documents. PIEPTEA gave the CW the Skype address "lampar222," and advised the CW to contact COJOCARU using that Skype address. Later that same day, COJOCARU and the CW engaged in a Skype video chat at that Skype address, during which COJOCARU described and displayed new holograms that COJOCARU had acquired for the purpose of creating more authentic-looking passports. COJOCARU advised that he would charge the CW 800 Euros for each false passport. In subsequent conversations between approximately June 2012 and July 2012, COJOCARU agreed to produce and sell three false passports to the CW, using photographs of the CW. On or about June 29, 2012, during another recorded Skype video chat, COJOCARU displayed false passports that COJOCARU had created for the CW containing the CW's photograph.

42. In addition, COJOCARU enlisted the CW's assistance in transferring $21,000 that COJOCARU and COJOCARU's coconspirator, FNU LNU, also known as "George Skyper" and "Tudor Barbu Lautaru" (referred to herein as "George Skyper" or

"Skyper"), had obtained from a victim who believed he was purchasing a car. On or about June 25, 2012, at approximately 1:00 a.m., during a recorded Skype conversation with the CW, COJOCARU contacted an individual who was using the Skype name "george skyper."[8] This individual ("Skyper") then joined the conversation with COJOCARU and the CW. Skyper advised the CW that he needed a bank account in order to wire money; the CW suggested a Citibank Kahn Account. During the conversation, Skyper provided the CW with the email address "numenume12345@yahoo.com" (the "NumeNume12345 Email Account") and the password to that account so that the CW could communicate with Skyper about the account information for one of the Citibank Kahn Accounts. Approximately 30 minutes after this conversation with Skyper, the CW told COJOCARU via Skype that the CW had provided the requested banking information in a message on the NumeNume12345 Email Account. Based on these and other communications with COJOCARU and Skyper, the CW understood that Skyper and COJOCARU were engaged in the same pattern of Internet fraud described herein, and that they needed a Citibank Kahn Account for the transfer of the victims' funds.

43.     Later on that same day, Skyper advised the CW that Skyper wished to transfer money to one of the Citibank Kahn

---

[8]     Skype has advised that the subscriber name for the Skype account "george skyper" is "Tudor Barbu Lautaru."

Accounts, but that Skyper was unable to access the account online. The CW then gave Skyper the "date of birth" for Kahn so that Skyper could access the account online.

44. On or about June 27, 2012, during a recorded Skype conversation with COJOCARU, the CW asked COJOCARU to provide information for the bank account where the CW was supposed to transfer Skyper's funds and make payment for the three passports supplied by COJOCARU. The CW and COJOCARU agreed that COJOCARU would leave a message with this information in the NumeNume12345 Email Account.

45. On or about June 27, 2012, during a recorded Skype conversation with Skyper, Skyper told the CW, among other things, that $21,000 would be wired to one of the Citibank Kahn Accounts from Pennsylvania and that another money transfer might come from Canada. The CW asked Skyper to tell COJOCARU to provide the wire transfer information using the NumeNume12345 Email Account. Shortly thereafter, the CW received a message on the NumeNume12345 Email Account indicating that $21,000 was going to be transferred by a victim in Pennsylvania (the "Pennsylvania Victim") for the purported purchase of a 1969 Dodge Charger. The CW also received a message containing information about a bank account in the Czech Republic. Based on the CW's prior communications with COJOCARU, the CW understood that the purpose of this message was to direct the CW to send payment for the

three false passports supplied by COJOCARU and to forward the victim transfers made by Skyper to the Czech bank account. On or about June 28, 2011, the CW, under the FBI's supervision, transferred a portion of these funds to this Czech bank account, with the remainder of the funds beings seized by the government.

46. On or about June 28, 2012, the CW advised COJOCARU, during a recorded Skype conversation, that the CW had wired approximately $13,650 to COJOCARU. The CW explained that this sum included $3,000 for the three false passports that COJOCARU had made for the CW, as well as COJOCARU'S 65% share of the $21,000 received from the Pennsylvania Victim. The CW confirmed to COJOCARU that the CW had wired the money to the Czech bank account described in the preceding paragraph. Notably, information received by Czech law enforcement authorities indicates that COJOCARU was residing in the Czech Republic during this time period.

47. On or about July 10, 2012, during another recorded Skype conversation, COJOCARU displayed the three false passports for the CW and described some of their features. On or about July 18, 2012, during a recorded Skype conversation, COJOCARU provided the CW with the tracking numbers corresponding to each package containing the passports the CW purchased from COJOCARU. COJOCARU also advised that he was regularly in contact with POPESCU. A week later, on or about July 25, 2012, the CW

36

received a false Slovak passport with the name "Gabriel Veres" and the CW's photograph.  On or about August 3, 2012, the FBI intercepted a package, destined for the CW, containing a false Dutch passport with the name "David Feiter" and the CW's photograph.  The CW never received the third passport.

D.   DANIEL ALEXE, NICOLAE GHEBOSILA and NICOLAE SIMION

48.   Between approximately July 2011 and August 2012, the defendant NICOLAE SIMION, also known as "Schilodul" and "Skilodul," and the CW engaged in multiple recorded conversations in which they discussed SIMION's involvement in the same pattern of Internet fraud and money laundering discussed herein.  SIMION and the CW further discussed SIMION's sources for fraudulent identification documents, including the defendants AUREL COJOCARU and FABIAN MEME, also known as "Fabian Maluka."

49.   For example, during a recorded telephone call on or about August 9, 2011, SIMION told the CW that "business," which the CW understood to mean the type of fraudulent transactions described herein, was going well in New York and throughout America.  In that context, SIMION discussed with the CW SIMION's sources for fake identification documents, which the CW understood were used to open bank accounts for the purpose of receiving victim funds.  On or about January 31, 2012, during a recorded Skype conversation, SIMION told the CW that he too makes false documents, but admitted that his documents are not as good

37

as those made by "Fabian" or "Aurel" (references to defendants FABIAN MEME and AUREL COJOCARU).  Months later, in or about June 2012, SIMION told the CW that he was relying on MEME instead of COJOCARU for false passports.

50.    In order to deposit victim funds, the CW provided SIMION with the account details for two bank accounts that the CW had previously opened - one of the Citibank Kemp Accounts discussed above and one of three accounts opened by the CW at J.P. Morgan Chase Bank in the name of "Melvin Kahn" using a false passport supplied by POPESCU (the "Chase Kahn Accounts"). In or about and between May and June 2012, SIMION arranged for the transfer of approximately $45,000 of victim funds into these bank accounts.  At SIMION's direction, the CW transferred a portion of these victim funds to a bank account that, based on the CW's prior communications with SIMION, the CW understood to be controlled by SIMION, with the government seizing the remainder of the funds.

### The Virginia Victim

51.    For example, on or about May 8, 2012, SIMION contacted the CW by telephone and notified the CW that money had been transferred into one of the Citibank Kemp Accounts and that SIMION would provide the CW with information as to where the CW should send the money.  The CW then received a message on the Yahoo! email account ndiv75@yahoo.com (the "Ndiv75 Email

Account"), which the CW shared with the defendants SIMION and DANIEL ALEXE for the purposes of the fraudulent scheme. This message contained an attachment from Bank of America indicating that $20,000 had been transferred by a victim buyer in Virginia (the "Virginia Victim") into one of the Citibank Kemp Accounts for the purported purchase of a car.

52.    On or about May 9, 2012, SIMION instructed the CW to wire the money from the Virginia Victim to three individuals via Western Union. Later that same day, the CW transferred a portion of the $20,000 to the individuals identified by SIMION, with the government seizing the remainder.

### The Canada Victim

53.    On or about May 24, 2012, the CW received a message on the Ndiv75 Email Account containing an attachment with wire transfer information indicating that a victim buyer in Canada (the "Canada Victim") had wired 11,000 Canadian dollars (approximately USD 10,500) to one of the Citibank Kemp Accounts on or about May 22, 2012.

54.    On or about May 25, 2012, the Canada Victim filed a complaint with IC3, stating that he had been communicating with an individual using the name "Kelly Grondin" regarding a 2005 Porsche 911S, which the Canada Victim had seen advertised on Les PAC, a Quebec website where items such as cars are posted for sale. In an email dated on or about May 19, 2012,

39

"Kelly Grondin" recommended that the Canada Victim pay for the Porsche using eBay Customer Services – which, according to the Canada Victim, reassured him that the sale of the Porsche was legitimate. After making the transfer, the Canada Victim further examined the eBay site to which "Kelly Grondin" had referred him and suspected that he had been the victim of fraud. When the Canada Victim contacted eBay, eBay confirmed that eBay had not been involved in the transaction the Canada Victim described. On or about May 24, 2012, the Canada Victim received a fraudulent email, purportedly from eBay, indicating that the payment had been received and that the car would be shipped. The Canada Victim never received the car. On or about May 25, 2012, pursuant to instructions the CW received from SIMION through the Ndiv75 Email Account, the CW transferred, by Western Union, a portion of the funds in one of the Citibank Kemp Accounts received from the Canada Victim to four names in Romania, with the government seizing the remainder.

     55.     SIMION also defrauded other victims, arranging for them to transfer their payments to the CW, including a victim from South Carolina who transferred approximately $15,000 for the purported purchase of a 2006 Malibu 23LSV boat fraudulently advertised on eBay.

     56.     SIMION is a close associate of the defendant DANIELE ALEXE, even introducing the CW to ALEXE. In a recorded

Skype conversation on or about June 25, 2012, SIMION told the CW that SIMION had a friend named "Alexe" who has a team in Florida that takes out money on "yellows and reds." The CW has advised that, based on the CW's experience and in the context of the fraudulent scheme described herein, "yellow" is a code word for Western Union and "red" is a code word for MoneyGram. The CW understood SIMION to be stating that SIMION's friend "Alexe" had arrows in Florida who received victim funds from Internet fraud via Western Union and MoneyGram transfers. SIMION then invited ALEXE to join the Skype conversation, and ALEXE confirmed that he has "guys" in Florida who pick up money from these wire transfer services. ALEXE further stated that his "guys" are Romanians who pick up the funds with European identifications and passports that have been made to match the name designated as the recipient of the wire transfers.

57. On or about September 28, 2012, the CW received a message on the Yahoo! email account mrskilo@yahoo.com (the "MrSkilo Email Account"), to which ALEXE, SIMION and the CW shared access for the purpose of the fraudulent scheme. The message listed information for two victims – a victim in Texas (the "Texas Victim") who had sent a wire transfer in the amount of $5,900 for what the victim believed was the purchase of a 2009 Toyota Tacoma Base, and a victim in Illinois (the "Illinois Victim") who was supposed to send a wire transfer in the amount

41

of $4,250 (the item of the Illinois Victim's purported purchase was not described in the message). Unbeknownst to ALEXE and SIMION, the Illinois Victim had already filed a complaint with IC3 stating that she had seen a 2009 Ninja ZX-14 motorcycle advertised on eBay by "ND Motors" and had exchanged emails with a "Kim Barnes," who had directed the Illinois Victim to send a money transfer in the amount of $4,250 to one of the Citibank Kemp Accounts. On or about September 21, 2012, the Illinois Victim took a check in the amount of $4,250 to a local Citibank branch to be deposited into one of the Citibank Kemp Accounts. Shortly thereafter, the Illinois Victim realized the transaction was a sham when "Kim Barnes" stopped responding to emails and the website for "ND Motors" stopped functioning. The Illinois Victim stopped payment on the check and the funds were, consequently, never received into the Citibank Kemp Account.

58.   During a conversation on or about September 28, 2012, the CW asked ALEXE what the CW should do with the $5,900 that had been received into one of the Citibank Kemp Accounts from the Texas Victim. On or about September 30, 2012, ALEXE told the CW that SIMION had been arrested and instructed the CW to "get the money out" quickly so that SIMION would have money to pay for an attorney. The CW said that the CW still needed the names of the intended recipients of the money transfers, and ALEXE told the CW to withdraw the funds first. A few hours after

42

this conversation, the CW received a message on the MrSkilo Email Account listing two recipients in Romania for two separate wire transfers of the funds from the Texas Victim.

59.     SIMION is also a close associate of the defendant NICOLAE GHEBOSILA, also known as Nicu Lutac," "Nicu A Lui Tac" and "Nicu Tac," and, in or about May 2012, SIMION introduced GHEBOSILA to the CW.  In a recorded three-way Skype conversation on or about May 19, 2012, SIMION, GHEBOSILA and the CW discussed an unsuccessful victim transfer into one of the Citibank Kemp Accounts.  SIMION told the CW that approximately $22,500 had been transferred into one of the Citibank Kemp Accounts.  The CW responded that the CW had not received this wire transfer in any of the Citibank Kemp Accounts, and asked SIMION for specific information regarding the transaction, including the type of vehicle that was sold, the amount of the sale and the name and address of the victim buyer.  SIMION referred these questions to GHEBOSILA, whom the CW understood, based on the CW's previous interactions and conversations with SIMION and the CW's knowledge of the fraudulent scheme, to be acting as the "hacker manager" for SIMION in this particular victim transaction.

60.     On or about September 22, 2012, in a recorded conversation, the CW asked GHEBOSILA why GHEBOSILA had stopped sending transfers of victim funds into the CW's bank accounts.

43

GHEBOSILA responded that SIMION had told GHEBOSILA that the CW was responsible for another money transfer that had not gone through. According to GHEBOSILA, based on this information from SIMION, GHEBOSILA decided not to conduct business with the CW anymore. GHEBOSILA and the CW then discussed how SIMION is a liar and how GHEBOSILA and the CW would not do business with SIMION anymore.

61. On or about October 2, 2012, in a recorded conversation, GHEBOSILA told the CW, in sum and substance, that "his people" were at work and would send the CW $4,000 to $5,000 per day over the following few days. Based on the CW's prior conversations and interactions with GHEBOSILA and the CW's knowledge of the fraudulent scheme, the CW understood this to mean that GHEBOSILA's team of hackers would send wire transfers of victim funds in amounts ranging from $4,000 to $5,000 to the CW's bank accounts.

62. On or about October 4, 2012, in response to an advertisement on eBay Motors for a 1997 Fleetwood Storm 34LS Motor Home, an individual in Massachusetts (the "Massachusetts Victim") sent a wire transfer in the amount of $8,200 to one of the Citibank Kahn Accounts opened by the CW and discussed above. On or about October 1, 2012, the so-called seller, using the name "Mary Carter," sent the following email message to the Massachusetts Victim in response to the Massachusetts Victim's

44

inquiry about the motor home that was advertised for sale on eBay
Motors:

> Thank you for showing interest in purchasing
> my motor home, the motor home is in great
> shape, no problems, damages, leaks or hidden
> defects.  It was always garaged and never
> smoked in.  The motor home was my husbands
> [sic] as he loved it very much, but he did
> not enjoy it so much as he died in IRAQ a few
> months ago.  It brings very bad memories to
> me and I want to get rid of it as soon as
> possible.  I'm a single mother with 2
> children and now I have some problems with
> the money and need to move as soon as
> possible and that's why I'm selling it so
> cheap.  The price is $8200.

On or about October 3, 2012, "Mary Carter" sent the Massachusetts

Victim a fraudulent email message purporting to be from eBay

Motors and containing an invoice with a fake eBay logo and

payment instructions directing the victim to send the funds to

one of the Citibank Kahn Accounts.  On or about October 4, 2012,

in a recorded Skype conversation, GHEBOSILA told the CW that

$8,200 had been sent to one of the Citibank Kahn Accounts.

GHEBOSILA also informed the CW that GHEBOSILA would provide the

victim's information and details about the transaction in a

message on Yahoo! email account versatul00000@yahoo.com (the

"Versatul00000 Email Account"), to which GHEBOSILA and the CW

shared access for the purpose of the fraudulent scheme.

GHEBOSILA told the CW that he would contact the CW later

regarding where to send the victim funds.  The CW subsequently

received a message on the Versatul00000 Email Account with the

subject line "8200" and containing details about the Massachusetts Victim transaction.  On or about October 5, 2012, the CW withdrew the victim funds from the account and provided the money to the government.

E.  FABIAN MEME

63.    Based on conversations with NICOLAE SIMION and others, described above in part, the CW learned that the defendant FABIAN MEME, also known as "Fabian Maluka," supplied fraudulent passports to individuals engaged in the same pattern of Internet fraud and money laundering described herein.  On or about July 25, 2012, the CW engaged in recorded Skype conversations with MEME and SIMION in which MEME advised that he would charge the CW 600 euros for each fraudulent passport. SIMION provided the CW with an email address which the CW could use to provide passport photographs for MEME to use in creating false passports for the CW.  MEME also mentioned that he would be traveling to the Czech Republic with Simion.  At one point during this audio Skype conversation, MEME put SIMION on the line, and SIMION proceeded to instruct the CW on withdrawing funds from an account that the CW and SIMION had used in the past.  SIMION also stated that he was conversing in an Internet café.  Thus, it appears that MEME was present when SIMION was discussing this money laundering transaction.

64.     On or about July 26, 2012, after the CW advised SIMION that the CW was unable to access the email account referenced in the preceding paragraph, SIMION provided a new email password for the account, which worked, and the CW uploaded the CW's photograph to the email account.

65.     On or about August 2, 2012, the CW transferred to MEME, by Western Union, approximately $1,600 (or approximately 1,200 euros) as payment for two false passports.

66.     On or about August 3, 2012, during a recorded conversation, MEME advised the CW that he had finished the passports and needed the CW's address in order to send the passports to the CW.  MEME, however, did not mail the passports to the CW, likely because MEME was arrested in the Czech Republic in the same time period.

67.     During a recorded conversation on or about August 6, 2012, the CW told MEME that the CW had heard from SIMION that MEME had "good depositing teams" (i.e., arrows).  MEME said that he had some "kids" working for him, and that MEME would put the CW in contact with them.

F.   EMIL BUTOI

68.     On or about September 10, 2012, NICOLAE SIMION provided the CW with contact information for the defendant EMIL BUTOI, also known as "Emil Popescu."  Based on prior

47

conversations, the CW understood BUTOI to be a fraudulent passport maker in London who worked with SIMION.

69.   On or about September 16, 2012, during a recorded conversation, BUTOI advised the CW that he primarily produced Portuguese and Danish passports, and that the passports BUTOI had created three weeks earlier worked well.  BUTOI further advised that an individual using one of BUTOI's false passports had been arrested in the United States but was subsequently released.  The CW understood BUTOI to mean that his false passport was of such high quality that the individual could not be prosecuted.

70.   When the CW advised BUTOI that the CW wanted two Portuguese passports, BUTOI instructed the CW to send a passport photograph as well as the CW's height, age and eye color.  BUTOI advised that he would mail the passports to the CW from England.  When the CW asked whether using FedEx would be safe, BUTOI advised that he had mailed passports hundreds of times and only one package had ever been stopped at the United States border.  BUTOI said that he charged 530 British pounds or 700 euros for a passport/driver's license set.  The CW and BUTOI agreed that the CW would send 1,400 euros for two passports plus the FedEx fee, by Western Union, to an address BUTOI would provide.  On or about September 19, 2012, the CW sent approximately $1,850 by Western Union pursuant to BUTOI's

instructions, and on or about September 27, 2012, BUTOI provided
the CW with the tracking number for the package containing the
false passports.

71. Notably, on or about September 27, 2012, in a
recorded Skype conversation, BUTOI showed the CW the two
fraudulent Portuguese passport/driver's license sets in the names
of "Carlos Correja" and "Batista Calado" that BUTOI had created
for the CW. The CW asked BUTOI if BUTOI's passports were "good
enough for opening [bank] accounts." BUTOI responded, in sum and
substance, that the passports he created were good enough, adding
that he was "one hundred percent, if not one thousand percent
sure that people have opened accounts" with these passports.
BUTOI added that his "associates" who buy false passports from
him have had "their people open up hundreds of accounts." BUTOI
further stated that he has done business with Russians and the
British, and that one of his "associates" had just bought some
false passports from BUTOI to send to Florida, Illinois and
Georgia for people to open up accounts there. BUTOI explained to
the CW that BUTOI does not "personally know" the people opening
up the accounts, that he only works with "associates" who buy the
passports from him to give to others who open up the accounts.
Based on the CW's prior conversations with BUTOI, the CW
understood references to "accounts" to mean "bank accounts."

72.    On or about October 1, 2012, FBI agents intercepted a FedEx package destined for the CW containing two Portuguese passports bearing the names "Carlos Correja" and "Batista Calado," as well as Portuguese identity cards in the same names, all containing the CW's photograph.

G.    CRISTEA MIRCEA and DRAGOMIR RAZVAN

73.    Between approximately May 2011 and July 2012, the CW engaged in multiple recorded conversations with the defendant CRISTEA MIRCEA regarding MIRCEA's involvement in the same pattern of Internet fraud and money laundering discussed herein.  Based on information provided by the CW and fraud victims, the investigation has revealed that, during the course of the investigation, MIRCEA organized the transfer of over $200,000 from victims to accounts that MIRCEA had opened for the receipt of victim funds.  In addition, MIRCEA and the CW engaged in multiple conversations during which MIRCEA discussed, generally, his criminal associates, the bank accounts MIRCEA used for the purpose of facilitating the fraudulent scheme and his sources for obtaining fraudulent passports used to open these bank accounts.

74.    For example, during a recorded conversation on or about October 27, 2011, MIRCEA discussed some false passports that MIRCEA had purchased from the defendant AUREL COJOCARU, and told the CW that COJOCARU was able to apply any type of visa to

the passports COJOCARU created.  MIRCEA also told the CW that MIRCEA had several bank accounts that were working.  Based on the CW's previous conversations with MIRCEA and the CW's knowledge of the fraudulent scheme described herein, the CW understood this to mean that MIRCEA had several bank accounts that were available to receive victim funds.

75.  On or about November 1, 2011, during another recorded conversation, MIRCEA told the CW that it was easier to work with Wells Fargo than with Bank of America.  Based on the CW's previous conversations with MIRCEA and the CW's knowledge of the fraudulent scheme described herein, the CW understood this to mean that it was easier to open bank accounts using fraudulent identification documents and to withdraw and transfer funds at Wells Fargo than at Bank of America.  During this conversation, MIRCEA also discussed the arrest of "the old man," and advised the CW that COJOCARU had delayed making a passport for an individual who had avoided arrest with the "old man."  Based on previous discussions with MIRCEA, including a conversation on October 31, 2011, in which MIRCEA described in detail the arrest of the "old man," the CW understood this to be a reference to the arrest of the Florida Coconspirator, described above in Paragraph 24.  The CW has further advised that the CW understood that MIRCEA, like the defendants NICOLAE POPESCU, DMITRU DANIEL BOSOGIOIU, ION PIEPTEA and NICOLAE SIMION, relied upon COJOCARU,

51

among others, for the production of fraudulent passports and
identification documents.

### The Indiana Victim

76.    On or about May 27, 2011, an individual in
Indiana (the "Indiana Victim") filed a complaint with IC3
alleging that on or about May 13, 2011, he responded to an
advertisement for a 2007 Lexus SC430 on Cars.com.  The Indiana
Victim stated that he communicated with an individual using the
name "Markus Thomsen" about the car.  The Indiana Victim further
stated that Markus Thomsen sent him photographs of the car, a
sales contract, a commercial invoice, title to the car and a
shipping reference number.   According to these documents, the
car was allegedly owned by "Ayres David Rundle Auto."   The
Indiana Victim stated that, on or about May 17, 2011, he wired
payment for the car in the amount of $24,900 to a Wells Fargo
bank account in the name of "Ayres David" (the "Wells Fargo Ayres
Account"), an account that MIRCEA told the CW he had established
to facilitate the fraudulent scheme.  However, after wiring the
payment, the Indiana Victim was unable to track the car using the
website provided in email correspondence and his attempts to call
the "shipping company" were unsuccessful.

77.    In a conversation on or about May 27, 2011,
MIRCEA, DRAGOMIR RAZVAN and the CW discussed a search warrant
that had been executed by the local police department in Irvine,

California at an apartment shared by MIRCEA, RAZVAN and one of their coconspirators. During the conversation, MIRCEA gave the phone to RAZVAN, who stated that, at "Nae's" direction, they had kept fraudulent passports at this apartment. Based on the CW's previous conversations with MIRCEA and RAZVAN and the CW's knowledge of the fraudulent scheme described herein, the CW understood this to mean that POPESCU had directed MIRCEA, RAZVAN and their coconspirator to keep the false passports in their apartment. In fact, in the course of the search, law enforcement officers recovered a fraudulent passport bearing a photograph of RAZVAN but in the name of "David Rundle," the fictitious car dealer who defrauded the Indiana Victim as described in the preceding paragraph.

<u>The Michigan Victim</u>

78.   On or about June 1, 2011, an individual in Michigan (the "Michigan Victim") filed a complaint with IC3 alleging that on or about May 16, 2011, he entered an agreement with a "Markus Tomsen" (the same name given to the Indiana Victim) to purchase a 2005 Mercedes SL 55. "Tomsen" identified himself as the used car manager for "Mesquite Autos" and instructed the Michigan Victim to wire $25,000 to the Wells Fargo Ayres Account. Subsequently, when the Michigan Victim attempted to contact "Tomsen," his calls were not answered. Bank records reflect that on or about May 16, 2011, the Michigan Victim

transferred $25,000 to the Wells Fargo Ayres Account, and surveillance video from a Wells Fargo branch in Santa Ana, California reflects MIRCEA making withdrawals from the Wells Fargo Ayres Account on May 17, May 21 and May 23, 2011.

### The North Carolina Victim

79.     On or about May 25, 2011, an individual in North Carolina (the "North Carolina Victim") filed a complaint with IC3 alleging that after responding to an advertisement for a 2009 Chevrolet Tahoe on Cars.com, the North Carolina Victim was contacted by an individual named "Markus" who claimed to be a representative of "Mesquite Auto/Ayres David Rundle Auto."  The North Carolina Victim transferred payment in the amount of $26,500 for the car on or about May 17, 2011 to a Bank of America account in the name of "David Rundle Ltd."  The car was never delivered and the North Carolina Victim's telephone and email inquiries were not answered.

### SCOPE OF THE FRAUD

80.     In addition to the proactive investigation described above, the FBI has also undertaken an analysis of the IC3 complaint database for roughly the same time period as this investigation (approximately April 2011 to early October 2012) in order to identify other potential victims of the Internet fraud schemes that form the basis of this complaint.  The FBI initially queried the IC3 database for unique identifiers that have emerged

during the course of this investigation, such as the purported
names of the "sellers" of the nonexistent merchandise (such as
"Stephen Wonder" and "Neuer Daniel Machado Cars"), the contact
information provided to the victims by the "sellers" (such as
telephone and fax numbers), and other unique information. As a
result of querying the IC3 database using this unique dataset,
the FBI identified approximately $2.2 million in additional
victim loss that was not detected during the course of the
proactive investigation because the CW was not involved in or
informed of those transactions.

      81.    This IC3 database analysis also revealed a
pattern of the perpetrators falsely identifying "Amazon Payments"
as the third party escrow/holding service, as described above
with respect to many of the defendants' victims. Based on this
pattern, the FBI also queried the IC3 database for all victims
who believed they were making payments via Amazon Payments (but
in reality were transferring the funds directly to the
perpetrators) in cases involving the same type of Internet
auction fraud as that perpetrated by the defendants (i.e., the
purported sale of cars, motorcycles and boats on such websites as
Autotrader.com, Cycletrader.com and eBay). This secondary
analysis, which was also limited to the time period of April 2011
to early October 2012, enabled the FBI to identify additional
victims who suffered a total loss of nearly $7 million.

82.    In sum, during the time period charged in this complaint, other victims who were not identified through the government's investigation lost over $9 million in similar fraudulent schemes.

WHEREFORE, your affiant respectfully requests that arrest warrants be issued for the defendants NICOLAE POPESCU, also known as "Nae," DANIEL ALEXE, DMITRU DANIEL BOSOGIOIU, also known as "Dmitru Busogioiu" and "Ioghi," EMIL BUTOI, also known as "Emil Popescu," AUREL COJOCARU, OVIDIU CRISTEA, also known as "Ica," NICOLAE GHEBOSILA, also known as Nicu Lutac," "Nicu A Lui Tac" and "Nicu Tac," FABIAN MEME, also known as "Fabian Maluka," CRISTEA MIRCEA, ION PIEPTEA, DRAGOMIR RAZVAN, also known as "One Arm," NICOLAE SIMION, also known as "Schilodul" and "Skilodul," and FNU LNU, also known as "George Skyper" and "Tudor Barbu Lautaru," so that they may be dealt with according to law.

56

FURTHER, your affiant requests that the Court order that this Complaint, as well as any arrest warrants issued pursuant to this Complaint, be sealed, until further order of the Court, to avoid alerting the defendants and their co-conspirators to the existence of this investigation.

Dated:     Brooklyn, New York
           October 25, 2012


STACY NIMMO
Special Agent
Federal Bureau of Investigation


Sworn to before me this
25th day of October, 2012


THE HONORABLE ROBERT M. LEVY
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK